# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan Humphrey Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 0892 | **DATE** | 4/12/2002 |
| **CASE TITLE** | United States of America vs. Terry L. Brewer, Jr. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motions to Suppress Evidence, to Exclude Testimony, and for Continuing Disclosure of Favorable Evidence

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's Motion to Suppress Evidence is denied. Defendant's Motion to Exclude Testimony is granted. Defendant's Motion for Continuing Disclosure of Favorable Evidence is denied without prejudice.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 16 2002 | 27 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/12/2002 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 01 CR 892 |
| ) | |
| TERRY L. BREWER, JR. ) | |

**DOCKETED**
APR 16 2002

MEMORANDUM OPINION AND ORDER

On February 27, 2002, the grand jury in a superseding indictment charged defendant, Terry L Brewer, Jr., with six counts of bank fraud in violation 18 U.S.C. § 1344, fraud in connection with access devices in violation of § 1029(a)(2), and making a false statement and making or using a false document in violation of § 1001(a)(2) and (3), in that defendant, while employed as an investment advisor at LaSalle Bank, a facility located in the Northern District of Illinois, fraudulently withdrew money from the accounts of LaSalle Bank's former client, Steve Kruzic. Before the court are defendant's motions to suppress evidence seized in a search of defendant's residence, to exclude testimony of the government's document examiner, and for continuing disclosure of favorable evidence. The court resolves them as set forth below.

## BACKGROUND

On March 6, 2000, LaSalle Bank fired defendant and reported to the Federal Bureau of Investigation ("FBI") its suspicion that defendant had taken funds from Kruzic's accounts without permission. According to the government, the responding Special Agents reviewed records relating to Kruzic's account, including security camera photographs which depicted an individual resembling defendant withdrawing funds from Kruzic's account at an ATM station, and records indicating withdrawals had been made with the ATM card totaling over $7,500.00 in little over one month.



The agents interviewed defendant on March 6 at the bank. Defendant admitted that he had purchased a personal computer for himself with funds from Kruzic's account without first obtaining authorization, but that Kruzic later signed a form authorizing the computer purchase. Defendant also admitted taking money from Kruzic's accounts using an ATM card, but explained that Kruzic had authorized the withdrawals because Kruzic suffered from health problems, which made it difficult for him to travel to the bank, so defendant would deliver the money to him at his residence.

Defendant told the agents that he had another document signed by Kruzic which gave defendant general authorization to conduct transactions on Kruzic's behalf. Although this document related to accounts at LaSalle Bank, defendant stated that it was not there at the bank and, when asked whether it was at his residence, he did not answer directly but stated he would not show it to the agents because they were "not on [his] side." Defendant stated that he kept a savings passbook for Kruzic's account in his desk. A Senior Investigator for LaSalle Bank, Rose Riccio, provided the agents with a copy of the savings passbook, which she found while searching defendant's desk area at the time defendant was being interviewed by the agents (according to the FD-302 form re Riccio, the investigating agents did not request this search).

The FBI attempted to interview Kruzic on March 6 but was unable to do so because Kruzic, who was 88 years-old at the time, was having surgery to install a pacemaker. The FBI did interview Kruzic on March 10, after receiving permission from medical staff at St. Anthony's Hospital. According to the government, Kruzic denied signing a document giving defendant consent to conduct transactions on his behalf, denied giving defendant permission to buy himself a personal computer with Kruzic's funds, and denied any knowledge of an ATM card being issued in connection with any of his accounts at LaSalle Bank. He stated he never possessed an ATM card.

2

Kruzic also told the agents that defendant had never delivered cash to him at his residence, nor did he give defendant permission to do so.

After hiring an attorney, defendant provided the government, on April 4, with a copy of a document purporting to be the general authorization form. The document appeared to have been signed by defendant and defendant's supervisor Donna Johnson who, according to defendant, could not recall signing the document but did confirm that the signature on the document was her "true signature." She also told the FBI that she believed Kruzic's signature was authentic. Kruzic died on or about April 22, 2000.

Defendant and his attorney voluntarily met with the FBI on May 11, 2000 and again explained the arrangement between Kruzic and defendant. Prior to the meeting, the FBI had requested defendant bring any records relating to Kruzic's accounts that were in his possession. At that meeting, defendant provided the agents a copy of a letter issued by GE Capital Assurance relating to a policy of unspecified nature with a premium of $52,814.11. The letter was addressed to Kruzic's residence and was dated March 30, 2000, more than three weeks after the defendant had been fired from LaSalle Bank. Defendant also provided copies of receipts for withdrawals from Kruzic's account, but admitted that original receipts relating to withdrawals from Kruzic's account were "kept at his residence and/or his briefcase." He also stated that the original authorization form was probably located at his desk at LaSalle Bank and that he had provided Kruzic's original savings passbook to Riccio on March 6, 2000. According to the government, Riccio advised the FBI that same day that she had not received the original savings passbook from defendant and the original authorization form had not been recovered by LaSalle Bank from defendant's desk.

On May 15, 2000, Special Agent, David Mertz, upon affidavit setting forth many (but not all) of the aforementioned facts, applied for and was granted a search warrant to search the home where defendant resided for a broad range of papers, such as lists, notebooks, receipts, bank records, as well as computer software containing financial data, computer hardware, and safe deposit box lease agreements and keys.

I.  **Motion to Suppress**

Defendant moves pursuant to Federal Rule of Criminal Procedure 12(b)(3), the Fourth Amendment to the United States Constitution, and *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress the fruits of the government's May 15, 2000 search of his residence. The Fourth Amendment requires that a warrant issue only "upon probable cause, supported by oath or affirmation." U.S. CONST. AMEND IV. In issuing a warrant to search a particular place, the magistrate judge must determine that there is probable cause to believe that a crime has been committed and that evidence of the crime will be found in the particular place for which the application to search is made. *See Berger v. New York*, 388 U.S. 41, 55 (1967) ("Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed."); *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) ("The Supreme Court explained in *Illinois v. Gates*[, 462 U.S. 213, 238 (1983),] that [t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

4

Because the Fourth Amendment's requirement of "probable cause, supported by oath or affirmation," is premised on the notion that the affiant will act in good faith in setting forth facts justifying the warrant, if defendant makes a substantial preliminary showing that the affiant either intentionally or recklessly included or omitted a false statement in his affidavit, and the misrepresentation was necessary to the determination of probable cause, then the court must hold an evidentiary hearing. *Franks*, 438 U.S. at 155-56, 165; *United States* v. *Whitley*, 249 F.3d 614, 620 (7th Cir. 2001); *United States* v. *Williams*, 737 F.2d 594, 604 (7th Cir. 1984).

Defendant argues he is entitled to a *Franks* hearing because he has made a substantial preliminary showing which undermines the existence of both aspects of probable cause. He argues that Special Agent Mertz in his affidavit deliberately or recklessly failed to mention Kruzic's health problems, misstated information garnered from the government's interview of Kruzic concerning the authorization form, failed to inform the magistrate judge that LaSalle Bank had already recovered Kruzic's passbook from defendant's desk, and failed to mention that defendant had already provided withdrawal receipts to the FBI, leading the magistrate judge to issue a warrant where, if all the facts had been revealed, he would not have found probable cause that defendant had defrauded Kruzic or that supporting documentation would be recovered from his residence.

Kruzic's Health

Defendant, relying on various FD-302 reports, argues that because the magistrate judge was not informed of Kruzic's health condition – his pacemaker surgery on March 6, 2000, that a neighbor who visited Kruzic in the hospital shortly thereafter testified he "sometimes . . . appears lost" and that he eventually died on April 22, 2000 – the magistrate judge was denied information concerning

5

Kruzic's competence on March 10 to make the denials of authorizations. The government argues that the fact that Kruzic was hospitalized does not mean that Kruzic could not accurately recall whether he had given defendant such authorization, nor does defendant present any medical opinion to this effect. Moreover, the government argues that the FD-302 reports, read as a whole, confirm his ability to understand that day.

The court concludes that the evidence submitted by defendant in his motion indicates that these omissions are neither misleading nor false. (*See* Def.'s Mot. to Suppress, FD-302 report, Ex. B (Kruzic's nephew, Robert Kruzic, advised, "[H]e did not believe his uncle was in any sort of poor condition which would require him to have a banker personally conduct his financial transactions and come to his home."); *id.*, Ex. C (Kruzic's neighbor, Irma Quintanilla, who visited him daily at hospital stated that Kruzic's understanding was better on some days than others and that on March 10, Kruzic "was in better shape and understood what was going on around him."); *id.*, Ex D (during interview of Kruzic himself, hospital personnel indicated "Kruzic was awake and appeared to understand what was going on" and "Kruzic advised that he was feeling alright and that he understood the agents"). Had Special Agent Mertz been more elaborate in the affidavit, the information would have confirmed, not detracted from, Kruzic's mental competency on the date of his interview. In any event, the affidavit did reveal that Kruzic was 88-years-old and might have had health problems; indeed, the affidavit seems to imply that defendant took advantage of these factors in committing the crime. (*See id.*, Ex. A, Mertz Aff. ¶ 4 (referencing Kruzic's age) and Mertz Aff. ¶ 5 (referencing Kruzic's[1] old age and diabetes)).

---

[1] Although the affidavit says "Brewer was old and had diabetes," it would have been clear to the issuing judge that this was an oversight and the government meant to name "Kruzic."

6

Kruzic Interview - the authorization form

Defendant argues that the affidavit's statement that "Kruzic . . . denied signing a form giving [defendant] consent to conduct transactions on his behalf" (*id.*, Ex. A, Mertz Aff. ¶ 10), is false because the FBI's FD-302 report of the Kruzic interview does not contain any reference to the signed authorization form and, thus, presumably either Kruzic did admit signing the form and Special Agent Mertz lied in the affidavit or such question was not posed and Special Agent Mertz made it up or at least recklessly included it. Defendant's argument suggests that Kruzic might have confirmed that he signed the form (but such confirmation is now impossible because he has died).

The government responds that the FD-302 report is "merely a summary of an interview and does not necessarily contain all the facts elicited from the interview." (Resp. at 16.) Further, the government points out that FD-302 report reflects that Kruzic was specifically asked whether he had authorized defendant to purchase a computer with his money, whether he had authorized defendant to obtain ATM cards so he could bring cash to Kruzic at his house, and whether Kruzic had authorized defendant to maintain a savings passbook and make withdrawals from his account, all of which Kruzic answered in the negative. (*See* Def.'s Mot. to Suppress, FD-302 report of Kruzic Interview, Ex. D.) The government maintains that because the FD-302 report contains a discussion of far more specific transactions at issue, "it would be illogical to simply assume, as the defendant has, that the interviewing agents asked Mr. Kruzic about these specific transactions without first determining whether he signed the alleged authorization letter." (Resp. at 16.) Alternatively, the government argues that if the court concludes that the affidavit is inaccurate in this respect, at most it was a negligent mistake since all of Kruzic's statements are consistent with the notion he had not signed an authorization.

7

Although the court does not disagree with the government that FD-302 reports are only summaries of interviews and may exclude some of what was said, it infers from its own experience with warrant applications[2] that a typically well-trained FBI agent would make likely note an important denial such as this. Special Agent Mertz did not otherwise overlook details of Kruzic's denials with respect to specific transactions. At least, for the purpose of this motion, the court will assume two possibilities: (a) that Kruzic admitted signing an authorization; or (b) that the specific question whether Kruzic signed an authorization form was not asked.

Defendant does not demonstrate that the false statement was material to the finding that there was probable cause that he committed bank fraud or related offenses. If the affidavit had merely omitted the statement that Kruzic had not signed an authorization form, there would still have been ample basis to find probable cause because of Kruzic's denials that he authorized the particular transactions. If, on the other hand, Kruzic admitted on March 10 that he had signed a form giving authorization to defendant to conduct transactions on his behalf, and if Special Agent Mertz had revealed it in the affidavit, that information would not have dispelled the inconsistencies between *defendant's* statements that the particular transactions were authorized and Kruzic's other denials and other evidence detailed in the affidavit.[3] The magistrate judge could reasonably have inferred from the facts presented to him that Kruzic was either deceived into signing the form or did not

---

[2]The undersigned served from 1982-1997 as a magistrate judge in this court.

[3]From January 21 to February 23, 2000, 17 withdrawals were made at various ATMs by an individual resembling defendant (*see* Def.'s Mot. to Suppress, Ex. A, ¶ 6); Kruzic denied any knowledge of an ATM card being issued in connection with his accounts (*id.*, ¶ 10); defendant told the agents he had given the original passbook to Riccio at the bank and had left the original signed authorization form in his desk (*id.*, ¶ 13); Riccio was unable to find the authorization form (*id.*, ¶ 14); and defendant admitted buying himself a computer with Kruzic's money (*id.*, ¶ 7), but Kruzic denied giving such authorization (*id.*, ¶ 10).

8

understand the implications of signing the form, but there is scant likelihood that he would have denied the warrant for lack of probable cause to believe that defendant had committed a crime.

<u>Materials Recovered From Bank/Already Provided to the Government</u>

Turning to the argument that probable cause did not exist for concluding that certain "banking documents" would be found at defendant's residence, defendant asserts that Kruzic's savings passbook had already been recovered from the bank, but paragraphs ¶¶ 9, 13 and 14 of the affidavit suggest that Kruzic's savings passbook was not at the bank and was likely to be recovered from defendant's residence. Defendant also argues that the affidavit only mentions defendant turning over one document in paragraph ¶ 15, a GE Capital Assurance policy, without mentioning as set forth in FD-302 of defendant's interview that he also showed the government receipts. Finally, defendant argues that the affidavit's statement in paragraph ¶ 17 that defendant said he "maintained at his own residence receipts related to withdrawals he made from Kruzic's accounts" is false (or at least incomplete) because the FD-302 report of defendant's interview indicates defendant told the government that the originals were at his "residence *and/or his briefcase.*"

The government responds that it was not seeking a warrant to obtain documents LaSalle Bank could provide or those defendant already provided, but to obtain documents defendant admitted he still possessed but refused to provide, despite repeated requests, including the original savings passbook and authorization form. The government argues that there was probable cause to support the conclusion that documents relating to defendant's scheme to defraud LaSalle Bank by stealing from Kruzic's account existed because defendant told the government eight weeks after he had been fired that he still had documents, i.e. original receipts, relating to withdrawals from Kruzic's account at his residence.

Defendant's argument that there was not probable cause that supporting documentation would be found at his residence posits the wrong issue. The issue is whether the affidavit supports probable cause that *evidence of the crime* would be found at defendant's home, not that particular documents would be there. *See* Fed. R. Crim. P. 41(b) ("A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense . . . ."). Where the government had the GE Capital document addressed to defendant's home and defendant had resisted producing originals that were not found at the bank,[4] and in the absence of other guidance as to where they might be, it was reasonable for the magistrate judge to infer that the defendant's home was a likely repository or, perhaps, a safe deposit box, evidence of which might be found in the home as well.[5]

The court concludes that none of the alleged misrepresentations or omissions is sufficient alone or together to satisfy defendant's burden of making a substantial preliminary showing which

---

[4]According to the affidavit, defendant stated on March 6 that Kruzic's savings passbook was at his desk at LaSalle Bank and refused to specify the location of the general authorization document (*see* Def.'s Mot. to Suppress, Ex. A, Mertz Aff. ¶ 9); on April 4, the government requested the original authorization document, savings passbook, and any other documents relating to Kruzic's financial transactions (*id.*, ¶ 11); on May 11, defendant told the government he gave the original passbook to LaSalle Bank's Rose Riccio, and the original authorization form was at his desk at LaSalle Bank (*id.*, ¶ 13); on May 11, Riccio denied that defendant had given the original passbook to her and stated the original authorization form was not at his desk (*id.*, ¶ 14). Although the FD-302 re Riccio merely represents what was found, rather than what was not found, there is nothing therein that contradicts this representation. (*See id.*, Ex. E.) The government avers that it was seeking the originals.

[5]With respect to not informing the judge that the receipts were at his residence "and/or" in his briefcase, this purported omission is immaterial, since had the information in the FD-302 of defendant's interview been more fully set forth this addition would merely confirm that there was a significant probability, if not certainty, that the original receipts *were* at his residence and that the originals were kept "with all other records he needed to maintain" indicating that other records were also at the residence. (*See* Def.'s Mot. to Suppress, Ex. F.)

10

would support holding a *Franks* hearing. Thus, no *Franks* hearing will be held and defendant's motion to suppress is denied [#14].

## II.  Motion to Exclude Testimony of Government's Document Examiner

Defendant moves *in limine* pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), Federal Rule of Evidence 702,[6] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), to exclude the government's document examiner, Danielle Seiger, from testifying at trial. In a February 8, 2002 letter, the government notified defendant of its intent to call Seiger, the government stated that she would testify

> ... that she examined the 'D. Johnson' signature contained on a letter provided by [defendant] to the [FBI] (the 'Questioned Signature') with known 'D. Johnson' signatures. ... that as a result of her examination, she concluded that the Questioned Signature is a reproduction of one of the known 'D. Johnson' signatures. ... that she examined the specimens using appropriate magnification and lighting, including side lighting and transmitted light. ... that she observed that the Questioned Signature superimposes one of the known signatures, and that extraneous markings on the Questioned Signature correspond to background printing that appears on the same known writing.

(Def.'s Mot. to Exclude, Ex. B.)

To admit expert testimony, the court must find that the "expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The first prong tests the reliability of the testimony; the second

---

[6] Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to under the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

11

prong tests its relevance. *Frey* v. *Chicago Conservation Ctr.*, 119 F. Supp. 2d 794, 497 (N.D. Ill. 2000). In *Kuhmo Tire*, the Supreme Court held that the test for reliability was not limited to scientists, but extended to experienced-based testimony. 526 U.S. at 150-51. Some of the factors useful in analyzing the reliability of an expert's testimony are (1) whether the technique or methodology has been or can be tested, (2) whether the technique or methodology has been subjected to peer review, (3) its known or potential rate of error and the existence of standards controlling the technique's operation; and (4) the extent to which the methodology or technique employed by the expert is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. These factors, however, are not a "definitive checklist or test." *Id.* at 593. And the factors may or may not be pertinent depending upon "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kuhmo Tire*, 526 U.S. at 150. The objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The proponent of the testimony bears ths burden of proving that their proffered testimony meets these requirements. *Frey*, 119 F. Supp. 2d at 797.

Defendant argues that Seiger's testimony will not assist the trier of fact because it appears she did nothing more than hold the known and questioned documents up to the light and made a visual inspection of the two signatures and there is no reason to think the jury is incapable conducting the same visual comparison. Defendant also argues that the government has failed to establish that Seiger's examination or conclusion is based on any field of expertise that is governed by sufficiently reliable principles and methods to satisfy any of the *Daubert* standards. Defendant cites several recent cases which have rejected the notion that the field of forensic document

12

examination is sufficiently reliable under *Daubert*. *See United States* v. *Saelee*, 162 F. Supp. 2d 1097 (D. Alaska 2001) (barring handwriting expert's testimony as to conclusions and mere description of similarities and difference because, absent tested principles for making such comparisons, the testimony would be just as likely to mislead as to assist jury); *United States* v. *Fujii*, 152 F. Supp. 2d 939 (N.D. Ill. 2000) (barring handwriting expert's testimony as to handprinting); *United States* v. *Hines*, 55 F. Supp. 2d 62, 67-68 (D. Mass. 1999) (barring testimony as to authorship of "stick-up" note but permitting testimony as to similarities between known handwriting and robbery note, but noting that this distinction would be difficult to enforce).

The government responds that it would be improper to bar Seiger's testimony based simply on the information set forth in the government's letter to defendant, without providing an opportunity to further develop the record. The government also requests that, in the event the court eventually concludes Seiger is not qualified to offer expert testimony as to her conclusions, she be permitted to testify as to her observations resulting from the examinations. Such testimony, the government contends, need only fulfill relevance requirements and not be subject to *Daubert/Kuhmo Tire*. Defendant replies that the latter request is for Seiger to testify as a lay witness which is prohibited by the rules as made clear by the amendments to Federal Rules of Evidence 701 and 702. *See* Fed. R. Evid. 701 Advisory Comm. Notes (2000) (Noting that Rules 701 and 702 were recently amended to "eliminate the risk that the reliability requirements set forth in Rule 702 will not be evaded through the simple expedient of proffering an expert in lay witness clothing.").

The court agrees that if Seiger is to testify at all, her proposed testimony must meet the reliability standards of Rule 702. *See* Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences

which are ... (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); *Saelee*, 162 F. Supp. 2d at (noting that government's document examiner's testimony was plainly inadmissible under Rule 701 because of subsection (c)). And although the court is aware that handwriting analysis is the type of testimony that has often been permitted by courts in the past, the government has offered no argument or even a hint of the type of evidence that it would forward to prove the reliability of the handwriting comparison testimony. In the cases cited by defendant, the courts held hearings and generally concluded that handwriting analysis did not pass muster because the evidence showed that, despite its long history of acceptance, the validation studies are few (and those that have been done have been criticized as methodologically flawed), there has been no peer review by an unbiased and financially disinterested community of practitioners, the potential error rate is largely unknown, and the technique suffers from a lack of controlling standards. *See Saelee*, 162 F. Supp. 2d at 1102-05; *Fujii*, 152 F. Supp. 2d at 940-41.

Although a hearing might be useful if the court were writing on a clean slate, the court's review of these very recent handwriting analysis cases, and in light of the very similar type of testimony at issue here, leads it to conclude that unless some new studies have been conducted in the past six months, the government would be hard-pressed to establish that Seiger's testimony would be sufficient under *Daubert*. Thus, the court grants defendant's motion to exclude Seiger's testimony [#15].[7]

---

[7]*But see* Fed. R. Evid. 702 Advisory Committee Notes ("Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *United States v. Richmond*, No. 00 CR 321, 2001 WL 1117235 (E.D. La. Sept. 21, 2001) (noting that Daubert was not "a steadfast rule that must be applied in every case" and the court would

## III. Defendant's Motion for Continuing Disclosure of Favorable Evidence

Defendant also moves pursuant to Federal Rule of Criminal Procedure 16, *Brady* v. *Maryland*, 373 U.S. 83 (1963) and *United States* v. *Giglio*, 405 U.S. 150 (1972), for a continuing order that the government immediately provide all evidence (documentary and otherwise) that would exculpate defendant or which could be used for impeachment. The government responds that it has and will comply with its discovery obligations. The court accepts this representation absent a motion to produce a specific item or document. This motion is denied without prejudice [#16].

ENTER: *Joan N. Lefkow*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: April 12, 2002

---

look to see if the government's handwriting expert's method was "reliable in nature and in application to the facts."). But without data that demonstrates that handwriting experts are more accurate in their judgments than the general population, experience alone does not suffice here. *Compare United States* v. *Plaza*, 179 F. Supp. 2d 492 (E.D. Pa. Jan. 7, 2002), *vacated on reconsideration*, ___ F. Supp. 2d ___, 2002 WL 389163 (E.D. Pa. Mar. 13, 2002) (FBI fingerprint expert could testify as to his opinions since "ACE-V" fingerprint identification technique or its equivalent was in widespread use and there was evidence that FBI fingerprinting experts very seldom made erroneous determinations).